**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TROY KNECHT and SHELLY | : | CIVIL ACTION NO. 4:17-CV-2267 |
| KNECHT, individually, and as parents | : | |
| and natural guardians of H.K. and G.K., | : | (Judge Conner) |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| JAKKS PACIFIC, INC., JAKKS | : | |
| SALES CORPORATION, and | : | |
| WAL-MART STORES, INC., | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiffs Troy Knecht, Shelly Knecht, H.K., and G.K., advance various

state-law tort claims against defendants JAKKS Pacific, Inc. ("Jakks Pacific"),

JAKKS Sales Corporation ("Jakks Sales"), and Wal-Mart Stores, Inc. ("Walmart").[1]

Defendants move for summary judgment on plaintiffs' strict liability and

misrepresentation claims, their various claims against Walmart, and their request

for punitive damages.  We previously granted defendants' motion in part.  (See Doc.

112).  For the reasons that follow, we will deny the remainder of defendants' motion.

---

[1] The complaint refers to this defendant as "Wal-Mart Stores, Inc."  (See generally Doc. 20).  The balance of the record, including this defendant's answer, clarifies that the entity is properly referred to as "Walmart, Inc."  (See Doc. 25 ¶ 9). We will refer to this defendant as "Walmart" herein.

I.    <u>**Factual Background & Procedural History**</u>[2]

Troy and Shelly Knecht are married and parents to minors H.K. and G.K. (<u>See</u> Doc. 20 ¶¶ 1-4).  The Knechts are citizens and residents of the Commonwealth of Pennsylvania.  (<u>See</u> <u>id.</u>)  Jakks Pacific and Jakks Sales are Delaware corporations with their principal places of business in California.  (<u>See</u> <u>id.</u> ¶¶ 5, 7; Doc. 24 ¶¶ 5, 7). Walmart is a Delaware corporation with its principal place of business in Arkansas. (<u>See</u> Doc. 25 ¶ 9).  Plaintiffs claim Jakks Pacific and Jakks Sales manufactured the toy at issue in this case and Walmart sold the toy.  (<u>See</u> Doc. 106-2 ¶ 3; Doc. 110-3 ¶ 3).

A.    **Disney Fairies Light Up Sky High Tink and Troy Knecht's Injury**

Plaintiffs allege the Disney Fairies Light Up Sky High Tink toy (the "Tink Toy")—purchased by Troy Knecht's mother on February 16, 2016—was defective. (<u>See</u> Doc. 106-2 ¶¶ 1-2; Doc. 110-3 ¶¶ 1-2).  The Tink Toy "consisted of a Tinkerbell fairy that could be launched into the air by placing the fairy into a plastic flower base launcher and pulling a cord as seen in the below photograph":

---

[2] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  M.D. PA. L.R. 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  <u>Id.</u>  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (<u>See</u> Docs. 106-2, 110-3).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.



(See Doc. 106-2 ¶ 5; Doc. 110-3 ¶ 5).  Plaintiffs assert that while Troy Knecht was

using the Tink Toy, the right wing disconnected from the toy as it launched into the

air, striking his right eye.  (See Doc. 106-2 ¶ 7; Doc. 110-3 ¶ 7).  The parties dispute

what caused the accident.

    **B.**    **Expert Reports**[3]

    The parties have submitted expert reports in support of their respective

claims and defenses.  Defendants filed a Daubert motion to exclude the opinions

and testimony of plaintiffs' experts, Dr. David Pope, Ph.D., and Anthony Paolo.

---

[3] The court convened oral argument on defendants' summary judgment
motion and a hearing on defendants' Daubert motions on July 21, 2021.  The court
reporter has provided the court with a rough transcript of the proceeding.  Citations
to the July 21, 2021 transcript are abbreviated as "7/21/21 Tr. __."  Pagination of the
rough draft may vary from pagination of the official transcript.

### 1.   *David Pope, Ph.D.*

Plaintiffs enlist Dr. Pope to offer expert testimony about the materials used in the Tink Toy and to opine on how exactly the Tink Toy broke. Dr. Pope holds a Bachelor of Science degree in Engineering Science from the University of Wisconsin, as well as Master of Science and Ph.D. degrees in Materials Science from the California Institute of Technology. (See Doc. 110-7 at 1). Dr. Pope has held various teaching positions in the field of materials science, most recently serving as a professor in the Department of Materials Science and Engineering at the University of Pennsylvania. (See id.) In addition to teaching, Dr. Pope has authored several academic publications in his field. (See id. at 2-6).

In his report, Dr. Pope offers one primary opinion regarding causation: "[T]he right arm failed progressively in fatigue by the formation of a crack on the inside surface of the arm, the crack grew progressively larger during use, and finally, when the crack became sufficiently large, the remaining cross section failed instantly and catastrophically." (Doc. 110-4 at 3). He also offers 19 more specific opinions, including proposed alternative designs for the Tink Toy. (See id. at 8-9).

### 2.   *Anthony Paolo*

Anthony Paolo offers various opinions regarding defendants' efforts to design the subject Tink Toy to ensure it was safe for use. Mr. Paolo received a Bachelor of Science degree in Mechanical Engineering from the University of Rhode Island, and a Master in Business Administration degree from Providence College. (See Doc. 110-9 at 4). As relevant here, Mr. Paolo has held various positions in the toy industry related to quality control and safety, including Vice President of Corporate

Quality at The First Years, Inc., and Senior Vice President of Corporate Quality and Global Product Safety at Summer Infant, Inc.  (See id. at 3-4).  More recently, Mr. Paolo founded Credo Advisors LLC, which offers advisory services to the children's products industry.  (See id. at 3).

In his report, Mr. Paolo opines that

> JAKKS failed to design a safe product, did not consider the 3 similar products recalled for causing injuries, including severe eye injuries, failed to test the product in an appropriate manner and in accordance with their internal, documented requirements, allowed an unsafe product to reach the marketplace, did not take consumer complaint reports, including those resulting in severe injuries, seriously, failed to act on the unsafe product by notifying the [Consumer Product Safety Commission] and the public through a voluntary recall and did not take timely and appropriate corrective action to fix the issues discovered and reported by consumers.

(Doc. 110-8 at 11).  He supports these opinions by citation to various documents produced during discovery.  (See generally Doc. 110-8).

**C.   Procedural History**

Plaintiffs filed their original complaint in this court in December 2017, and an amended complaint in January 2018, to which all defendants answered.  After a period of discovery, defendants collectively filed an omnibus Daubert and summary judgment motion.  Defendants seek summary judgment on each of plaintiffs' strict liability and misrepresentation claims, their various claims against Walmart, and their request for punitive damages.  In their Daubert motion, defendants seek to preclude Dr. Pope and Mr. Paolo from testifying at trial.

In response to defendants' summary judgment motion, plaintiffs conceded the following claims: strict liability – failure to warn (Count III); strict liability – manufacturing defect (Count II); misrepresentation (Count V); and all claims against Walmart.  We memorialized these concessions in an order dated June 23, 2021.  Thus, the only remaining substantive issues in this motion are plaintiffs' strict liability – design defect claim and their punitive damages request as to Jakks Pacific and Jakks Sales, and the admissibility of plaintiffs' expert testimony.  On July 21, 2021, we convened for oral argument on the remaining summary judgment issues and an evidentiary hearing on the <u>Daubert</u> motion.  The motion is fully briefed and ripe for disposition.

## II.   <u>Legal Standards</u>

### A.   <u>Daubert</u> Challenges

Admissibility of expert testimony is governed by Federal Rule of Evidence 702.  <u>See</u> Fed. R. Evid. 702; <u>see also</u> <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 588-89 (1993).  Trial courts must act as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is . . . reliable." <u>Daubert</u>, 509 U.S. at 589. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  The Third Circuit Court of Appeals has explained that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."  Schneider *ex rel.* Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (citation omitted).  Rule 702 embraces a "liberal policy of admissibility," pursuant to which it is preferable to admit any evidence that may assist the trier of fact.  Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)).

## B.    Summary Judgment

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor."  Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.  See Pappas, 331 F. Supp. 2d at 315.

III.   **Discussion**

   A.   **Daubert Motions**

Defendants seek to exclude the opinions of Dr. Pope and Mr. Paolo not on the theory that they are unqualified in their respective fields, but that the substance of their opinions violates Federal Rule of Evidence 702.[4]  Defendants claim that both opinions are unreliable and unfit, and additionally argue that Dr. Pope's opinions are prejudicial.

Expert testimony is "reliable" when it is based upon sound methodology and technique.  In re Paoli, 35 F.3d at 742.  The touchstone is whether the expert's methodology is "sufficiently reliable so that it will aid the jury in reaching accurate results."  Id. at 744 (internal quotation marks omitted).  An expert opinion cannot be based on "subjective belief and unsupported speculation."  UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 825, 834 (3d Cir. 2020).  However, "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness."  In re Paoli, 35 F.3d at 744.  Our court of appeals has explained that "[a]s long as an expert's scientific testimony rests upon 'good grounds, based on what is known,'" it should be admitted.  See United States v. Mitchell, 365 F.3d 215, 244 (3d Cir. 2004) (citation omitted); Kannankeril, 128 F.3d at 806 ("Admissibility

---

[4] We independently conclude, based on the materials submitted in connection with the experts' reports and the information elicited at the July 21 hearing, that both proposed experts are qualified for purposes of Rule 702.  See Schneider, 320 F.3d at 404 (citation omitted).

decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined.").

The Third Circuit has enumerated various factors to guide the court's reliability inquiry:

> (1) whether a method consists of a testable hypothesis;
> (2) whether the method has been subject to peer review;
> (3) the known or potential rate of error; (4) the existence
> and maintenance of standards controlling the technique's
> operation; (5) whether the method is generally accepted;
> (6) the relationship of the technique to methods which
> have been established to be reliable; (7) the qualifications
> of the expert witness testifying based on the methodology;
> and (8) the non-judicial uses to which the method has
> been put.

Pineda, 520 F.3d at 247-48 (citing In re Paoli, 35 F.3d at 742 n.8).  This list of factors is a "convenient starting point," but is "neither exhaustive nor applicable in every case." Kannankeril, 128 F.3d at 806-07.  United States Supreme Court precedent emphasizes that "relevant reliability concerns may focus upon personal knowledge or experience." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999). Accordingly, the Rule 702 reliability inquiry is "a flexible one," and the factors considered must be applicable to the facts of the case.  Id. (quoting Daubert, 509 U.S. at 594).

Expert testimony must also be "sufficiently tied to the facts of the case, so that it 'fits' the dispute and will assist the trier of fact." UGI Sunbury, 949 F.3d at 832 (internal quotation marks omitted).  The concept of fit "is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." Id. at 835 (quoting Daubert, 509 U.S. at 591).  Specialized or

scientific knowledge may still be excluded if it is not specialized knowledge "for the purposes of the case." Id. (quoting In re Paoli, 35 F.3d at 743).  Whether an expert's testimony fits the dispute is not an exacting standard, but "is higher than bare relevance." United States v. Schiff, 602 F.3d 152, 173 (3d Cir. 2010) (quoting In re Paoli, 35 F.3d at 745).

### 1. *David Pope, Ph.D.*

Defendants argue Dr. Pope's expert opinion is unreliable, unhelpful, and prejudicial.  We take up, and ultimately reject, each theory in turn.

### a. Reliability

Dr. Pope opines in his report that the Tink Toy's "right arm failed progressively in fatigue by the formation of a crack on the inside surface of the arm, the crack grew progressively larger during use, and finally, when the crack became sufficiently large, the remaining cross section failed instantly and catastrophically." (Doc. 110-4 at 3).  In rendering his opinion, Dr. Pope nondestructively examined the subject toy via "visual inspection and photography, followed by optical microscopic examination and imaging, followed by Attenuated Total Reflection Fourier Transform Infrared . . . spectroscopy to identify the materials involved."  (Id. at 2). Dr. Pope also performed a "low speed pull test" to "confirm the rotational direction of the doll during launch and . . . to count the number of rotations of the doll while the string is being pulled."  (Doc. 110-5, Pope Dep. 62:6-63:9).  Using the information gleaned from these methods, and after employing "[s]imple calculations," (Doc. 110-4 at 4; see Doc. 110-13), Dr. Pope offered 19 opinions regarding the Tink Toy's defective design.

Defendants contend Dr. Pope's methods are unreliable because he cannot explain exactly how the preexisting crack formed, he provides inadequate bases for his opinions as to crack propagation, and he fails to offer a sufficient methodology in connection with his proposed alternative designs.  (See Doc. 106-3 at 6-12).  As to the initial crack formation, Dr. Pope clarified at the July 21 hearing that the crack found on the inside of the Tink Toy's wing formed at a "parting line" during the manufacturing process, prior to plaintiffs' use of the toy.  (See 7/21/21 Tr. 80:10-81:3, 84:10-85:5, 99:14-100:7; see also Doc. 110-4 at 3 (describing "beach marks," which are evidence of "fatigue failure," or the progressive growth of the crack); Doc. 110-4 at 5 (ruling out crack caused by "impact damage"); Doc. 110-6 at 2-3 (same)).  Dr. Pope ruled out plaintiffs' use of the Tink Toy, or some other form of impact damage, as the root cause of the preexisting crack.  He has therefore sufficiently explained the bases for his opinion concerning the crack's formation.  Defendants' disagreements with Dr. Pope's conclusions and methodology go to the weight of his testimony, as opposed to its admissibility.

We will likewise admit Dr. Pope's opinions on propagation and fatigue failure.  Defendants do not argue that nondestructive examination techniques or the low-speed pull tests are *per se* unreliable.  They instead appear to simply disagree with Dr. Pope's methodological approach, arguing it amounts to "pure speculation and conjecture."  (Doc. 106-3 at 7).  However, as described above, Dr. Pope enlists a variety of different analytical tools to reach his conclusions, and he describes how and why those tools inform his opinions.  (See generally Docs. 110-4, 110-6, 110-13).  Dr. Pope's conclusions are also supported by his extensive

qualifications in the field of materials science, which certainly undergird his evaluation in this case.  (See generally Doc. 110-7).  We therefore conclude that Dr. Pope's testimony is based on "good grounds" and is therefore admissible.  Mitchell, 365 F.3d at 244 (citation omitted).  Although defendants criticize Dr. Pope for failing to do more to support his conclusions, admissibility does not depend on the possibility that the "expert might have done a better job."  Oddi v. Ford Motor Co., 234 F.3d 136, 156 (3d Cir. 2000) (quoting Kannankeril, 128 F.3d at 809).  On this point as well, defendants' concerns regarding the perceived inadequacies in Dr. Pope's opinions go more to the weight of his testimony—which may be challenged via cross-examination—than to its admissibility.

Defendants also seek exclusion of Dr. Pope's alternative-design opinions on the theory that Dr. Pope's failure to "build any such alternative designs and . . . to test the feasibility and application of such alternative designs" renders his opinion unreliable.  (See Doc. 106-3 at 10).  In other words, they claim Dr. Pope's alternative-design opinion is speculative and unfounded.  (See id. at 10-12).  As we explained above, expert opinions must be founded in more than mere "subjective belief and unsupported speculation."  UGI Sunbury, 949 F.3d at 834.  Yet experts need only offer "good grounds" for their opinions; they need not necessarily be "correct[]."  See Mitchell, 365 F.3d at 244; In re Paoli, 35 F.3d at 744.  Dr. Pope provided explanations regarding the propriety and usefulness of his proposed alternative designs in his report, (see Doc. 110-4 at 4-5, 7-9), and at the July 21 hearing, see 7/21/21 Tr. 81:20-85:5.  Although Dr. Pope did not recreate the Tink Toy, implementing each of these proposed alternatives, we are not left with a

situation in which Dr. Pope "used little, if any, methodology beyond his own intuition," or in which "no standards control his analysis." Oddi, 234 F.3d at 158. Furthermore, Dr. Pope's conclusions are clearly based on his extensive "personal knowledge or experience" in this specialized industry. See Kumho Tire, 526 U.S. at 150. Defendants remain free to challenge the explanations provided by Dr. Pope in his report and at the July 21 hearing. But those challenges go to weight, not admissibility. Consequently, we will admit Dr. Pope's opinion regarding proposed alternative designs.[5]

### b.   **Fit**

Defendants next contend that Dr. Pope's testimony is unfit for this case because it is not based on reliable methods. (See Doc. 106-3 at 12-13). As described *supra*, we disagree and therefore find no merit in defendants' fitness arguments on this ground. Defendants alternatively argue that perceived errors in Dr. Pope's calculations render his opinions unfit as unreliable. (See id. at 13). Plaintiffs claim that any numerical differences between defendants' expert calculations and Dr. Pope are simply "rounding errors." (See 7/21/21 Tr. 72:5-6). In any event, these perceived errors are better suited for cross-examination. As we explained above, Dr. Pope provided his calculations supporting his opinions, thereby providing

---

[5] Defendants also argue that Dr. Pope's opinions should be excluded as prejudicial because they are "not derived from the methods and procedures of science." (See Doc. 106-3 at 13). Specifically, defendants claim: "Because his opinions are utter speculation and manifestly unreliable, they have no probative value and are highly prejudicial." (Id.) As explained above, we disagree that Dr. Pope's opinions are unreliable. Accordingly, we conclude that the probative value of Dr. Pope's opinions is not substantially outweighed by the danger of unfair prejudice to defendants. See FED. R. EVID. 403.

"good grounds" for his conclusions.  (See Doc. 110-13).  Again, the parties'

disagreements regarding appropriate numerical values inform the weight of each

expert's testimony, not its admissibility.  Therefore, given Rule 702's "liberal policy

of admissibility," Pineda, 520 F.3d at 244, we will admit Dr. Pope's testimony as fit

for this case.

### 2.  *Anthony Paolo*

Defendants also argue that Mr. Paolo's opinions regarding defendants'

testing and prior recalls of other toys should be excluded as unfit for this action.

(See Doc. 106-3 at 14-20).[6]

### a.  Testing

As relevant here, defendants challenge Mr. Paolo's opinion that "Jakks failed

to drop test the toy from 10 feet, failed to perform product life testing to 1000 cycles,

and failed to test to ensure the Toy did not launch when the launcher was angled

more than 30 degrees."  (Doc. 106-3 at 14).  Defendants broadly criticize Mr. Paolo

for failing to test toys with preexisting cracks.  (See id.; Doc. 111 at 11-12).  At the

July 21 hearing, however, Mr. Paolo clarified that additional testing of the kind he

recommends could have uncovered cracks in the Tink Toy that led to detachment

of its wing.  (See 7/21/21 Tr. 102:4-25).  In other words, Mr. Paolo's opinion is that,

---

[6] In their reply, defendants assert that they seek exclusion of Mr. Paolo's other opinions for the same reasons they claim his testing and recall opinions are inadequate.  (See Doc. 111 at 13-14).  Aside from blanketly arguing "[t]here is no nexus between Paolo's opinions regarding Defendants' conduct and the defect identified by Dr. Pope," defendants fail to precisely articulate why Mr. Paolo's other opinions are inadmissible.  (See id.)  In any event, as we explain below, Mr. Paolo's opinions are admissible.  We therefore decline to exclude Mr. Paolo's related opinions.

had defendants performed this testing, they could have discovered weaknesses in the Tink Toy.  (<u>See</u> Doc. 110-8 at 4).  And, had they discovered those weaknesses, they could have taken steps to design the Tink Toy in such a way to mitigate any flaws in its wings.  (<u>See</u> <u>id.</u>)  Thus, while Mr. Paolo does not specifically opine that his recommended testing should have been performed on toys with preexisting cracks, his opinion is relevant and informative in this matter because he opines this testing could have revealed a molding defect or the Tink Toy's propensity to crack, causing the Tink Toy's wings to detach.

We find defendants' arguments regarding drop testing and product life testing unpersuasive for similar reasons.  Defendants attempt to create a disconnect between Mr. Paolo's opinion and plaintiffs' claim by asserting the circumstances of this case render the identified testing irrelevant.  To illustrate, Mr. Paolo opines that drop testing from 10 feet and life cycle testing to 1000 cycles should have been performed on the Tink Toy.  Defendants contend this testing "would not provide Jakks with information relevant to the minimal use of the subject Toy" because it was not launched up to 10 feet and it was only used 14 to 20 times.  (<u>See</u> Doc. 106-3 at 15).  As we explain above, Mr. Paolo's opinions are not so limited: he concludes that this testing should have been conducted as a matter of course to determine whether the Tink Toy's design contained defects.  That is, defendants' use of a rigorous testing regime would have, over time, uncovered flaws in the Tink Toy, regardless of any one Tink Toy's individual use.  We therefore conclude that Mr. Paolo's opinions in this regard are relevant and fit for this case, as they inform

whether the procedures followed by defendants could have uncovered design defects.[7]

###    b.   <u>Recalls</u>

Defendants also argue that Mr. Paolo's recall-based opinions are inadmissible as unhelpful to the factfinder because they are unsupported by a reliable scientific methodology.  (<u>See</u> Doc. 106-3 at 16-20).  Plaintiffs point out that Mr. Paolo's opinions are nonscientific in nature.  Courts reviewing challenges to an expert's nonscientific opinion should consider the <u>*In re* Paoli</u> and <u>Daubert</u> factors to the extent they are "reasonable measures of the reliability of expert testimony." <u>Elcock v. Kmart Corp.</u>, 233 F.3d 734, 746 (3d Cir. 2000) (quoting <u>Kumho Tire</u>, 526 U.S. at 152).  In nonscientific cases, however, the "relevant reliability concerns may focus upon personal knowledge or experience."  <u>Kumho</u>, 526 U.S. at 150.

We will admit Mr. Paolo's opinions regarding prior recalls of other toys that he believes should have informed defendants' design decisions.  In his report, Mr. Paolo identifies three recalls of toys with similar characteristics to the Tink Toy in this case.  (<u>See</u> Doc. 110-8 at 3).  Like the Tink Toy, the wings of two of those previously recalled toys had reportedly broken off during use, resulting in eye injuries.  (<u>See</u> <u>id.</u>)  The third toy had reportedly struck users, causing eye injuries.

---

[7] Plaintiffs concede that one of Mr. Paolo's recommended testing protocols—ensuring that the Tink Toy could not launch at certain angles—would have been futile in this case because the toy did in fact have launch restrictions.  (<u>See</u> Doc. 110 at 19 n.7).  They nonetheless contend the failure to test for limiting launch angles is evidence of defendants' purported recklessness more generally.  (<u>See</u> <u>id.</u>)  We agree that defendants' decisions to test or not test speaks to their mental state, which informs our punitive damages analysis, so we will not exclude Mr. Paolo's opinion regarding launch angles at this juncture.

(See id.)  In highlighting the importance of these recalls, Mr. Paolo cites defendants' internal documents which note that defendants should consider comparable recalls and complaints when designing their products to ensure they do not cause harm to consumers.  (See id.)  Importantly, Intertek—an independent third-party consultant—also identified three of these recalls in its hazard assessment, in which it recommended the "design of the submitted sample [of the Tink Toy] should be revised."  (See Doc. 110-12).  The identification of these recalls by a neutral third party bolsters Mr. Paolo's reliance on them and lends credence to the conclusions he ultimately draws.  Mr. Paolo also plainly employs his extensive experience in the toy safety industry, (see generally Doc. 110-9), in addition to materials available to him regarding these recalled toys, in concluding that these recalls are relevant and material to the design of defendants' Tink Toy.  To the extent defendants believe material differences between the recalled toys undermine Mr. Paolo's opinions, they are free to pursue that theory on cross examination.  Those differences, like many of the other arguments defendants raise, go more to the weight of Mr. Paolo's testimony, not its admissibility.

### B.    Summary Judgment

#### 1.    *Design Defect*

Defendants argue that plaintiffs' design defect claim fails as a matter of law for two reasons.  *First*, they claim the Tink Toy contained a "material alteration" such that plaintiffs cannot maintain a claim for design defect.  *Second*, they contend the Tink Toy was not in a "defective condition."  Genuine disputes of material fact preclude us from granting summary judgment on either ground.

a.   **Substantial Change or Material Alteration**

The Pennsylvania Supreme Court applies Section 402A of the Restatement (Second) of Torts in strict liability cases.  See Webb v. Zern, 220 A.2d 853 (Pa. 1966); see also Tincher v. Omega Flex, Inc., 104 A.3d 328, 394-400 (Pa. 2014) (declining to adopt Restatement (Third) of Torts in strict liability cases).  Under Section 402A,

> (1) One who sells any product in a defective condition unreasonable dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if:
>
> > (a) the sellers engage in the business of selling such a product; and
> >
> > (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

RESTATEMENT (SECOND) OF TORTS § 402A (AM. LAW INST. 1965).  Consequently, plaintiffs must demonstrate that "the product was defective, that the defect was a proximate cause of the plaintiff's injuries, and that the defect causing the injury existed at the time the product left the seller's hands."  Davis v. Berwind, 690 A.2d 186, 267 (Pa. 1997) (citation omitted).

It follows that defendants are not strictly liable if an unforeseeable "substantial change" amounts to a superseding cause of a plaintiff's injury.  See Gonzalez v. Thomas Built Buses, Inc., 934 F. Supp. 2d 747, 754 (M.D. Pa. 2013) (citing Putt v. Yates-Am. Mach. Co. 722 A.2d 217, 220-21 (Pa. Super. Ct. 1998); Meeks v. APV Ltd., No. 00-4191, 2002 WL 32349781, at *1 (E.D. Pa. Feb. 5, 2002)); see also PA. SSJI (CIV) § 16.120 (articulating "substantial change" affirmative defense).

Questions of "whether a change to the product was substantial, and whether that change was reasonably foreseeable, are generally for the jury." <u>Sikkelee v. Precision Airmotive Corp.</u>, 907 F.3d 701, 716 (3d Cir. 2018) (citing <u>Merriweather v. E.W. Bliss Co.</u>, 636 F.2d 42, 44-45 (3d Cir. 1980); <u>Hamil v. Bashline</u>, 392 A.2d 1280, 1287-88 (Pa. 1978); <u>D'Antona v. Hampton Grinding Wheel Co.</u>, 310 A.2d 307, 310 (Pa. Super. Ct. 1973)).

Dr. Pope opined at the July 21 hearing, to a reasonable degree of professional certainty, that the crack on the subject Tink Toy was created before and independent of the Knechts' use of the toy. (<u>See</u> 7/21/21 Tr. 80:10-81:3, 84:10-85:5, 99:14-100:7; <u>see also</u> Doc. 110-4 at 3 (describing "beach marks" as evidence of "fatigue failure" stemming from an initial crack); Doc. 110-4 at 5 (ruling out crack caused by "impact damage"); Doc. 110-6 at 2-3 (same)). In other words, according to Dr. Pope, the crack formed during the manufacturing process and therefore existed before it left defendants' hands. Dr. Pope further opines that this alteration was foreseeable, given the parting line created during the Tink Toy's fusing. (<u>See</u> Doc. 110-4 at 3). We therefore conclude that a genuine dispute of material fact exists as to whether the product was substantially and foreseeably changed at some point between leaving defendants' hands and reaching the consumers in this case. We will consequently deny defendants' motion for summary judgment on this theory.

**b.**     <u>**Defective Condition**</u>

Defendants alternatively argue that summary judgment is appropriate because the Tink Toy was not in a "defective condition" as defined in <u>Tincher v. Omega Flex, Inc.</u>, 104 A.3d 328 (Pa. 2014). The Pennsylvania Supreme Court in

<u>Tincher</u> articulated two methods by which plaintiffs can establish a "defective condition": the consumer-expectations test and the risk-utility test.

Under the consumer-expectations standard, a "product is in a defective condition if the danger is unknowable and unacceptable to the average or ordinary consumer." <u>Tincher</u>, 104 A.3d at 394 (citation omitted). In making this determination, we consider, *inter alia*, "[t]he nature of the product, the identity of the user, the product's intended use and intended user, and any express or implied representations by a manufacturer or other seller." <u>Id.</u> at 394-95 (citations omitted).

Under the risk-utility standard, "a product is in a defective condition if a 'reasonable person' would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions." <u>Id.</u> at 397 (citations omitted). For this standard, we weigh seven factors:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
>
> (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.
>
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
>
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
>
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.
>
> (6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or

instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

Id. at 398-99 (citation omitted).  Whether a product is defective "is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue."  Sikkelee, 907 F.3d at 716 (quoting Tincher, 104 A.3d at 335).  We address defendants' challenge under both of these frameworks.

Defendants argue only that plaintiffs cannot satisfy the consumer-expectations standard because "the 'danger' identified by Plaintiffs' expert is not a defect of the Tink Toy itself, but is, instead, the failure of the Tink Toy to withstand unexplained damage which Plaintiffs' experts [sic] admit was not a result of the design process."  (Doc. 106-3 at 22).  Dr. Pope, however, testified at the July 21 hearing that the defect in the Tink Toy was the design that allowed a crack—which formed at some point prior to plaintiffs' use of the toy—to grow and eventually rupture, causing the wing to detach from the toy's body and resulting in Troy Knecht's injury.  (See 7/21/21 Tr. 95:22-100:7).  Plaintiffs have therefore adequately identified the Tink Toy's perceived defect.  Accordingly, we will deny defendants' motion on this theory.

Defendants also challenge plaintiffs' claim under the risk-utility standard.  Defendants argue "the likelihood of injury and probability of serious injury are extremely low and within the normal acceptable range for the toy industry."  (Doc. 106-3 at 23).  In support of this contention, defendants claim they received only a

handful of complaints about the Tink Toy over 12 years, during which it sold
roughly 1.2 million units.  (Id.)  Plaintiffs rebut this argument by pointing to Mr.
Paolo's report, in which he explains other consumers' complaints regarding broken
Tink Toy wings, and recalls of analogous toys, put defendants on notice that injuries
could result from the toy.  (See Doc. 110 at 27-28; see also 7/21/21 Tr. 102:4-24).  In
light of this competing opinion, we conclude a genuine dispute of material fact as to
the Tink Toy's defective nature exists, and that a reasonable juror could find that
the toy was defectively designed.

Defendants further claim plaintiffs' design defect claim fails because they
have not put forth a reasonable alternative design for the Tink Toy.  (See Doc. 106-3
at 23-25).  This failure, defendants argue, is fatal because plaintiffs are "required to
identify a reasonable alternative design."  (Id. at 23 (citing Kordek v. Becton,
Dickinson & Co., 921 F. Supp. 2d 422, 430-31 (E.D. Pa. 2013)).  At the outset, we are
not convinced that a reasonable alternative design is, as a legal matter, an absolute
prerequisite to a design defect strict liability claim in Pennsylvania.  Defendants
have not offered a post-Tincher decision holding as much.  Furthermore, the
Pennsylvania Supreme Court in Tincher recognized that the "availability of a
substitute product" is but one of the "factors relevant to the manufacturer's risk-
utility calculus implicated in manufacturing or designing a product."  Tincher, 104
A.3d at 398.  And the Pennsylvania Supreme Court in Lance v. Wyeth, 85 A.3d 434
(Pa. 2014), rejected any requirement that plaintiffs present a safer alternative design
to prevail on their design defect claim sounding in ordinary negligence.  See Wyeth,
85 A.3d at 458 n.36.

In any event, plaintiffs have put forth enough evidence regarding alternative designs to survive summary judgment.  In his report and at the July 21 hearing, Dr. Pope explained that several different alternative designs could have prevented the defect in this case.  For example, he opined that, had defendants constructed the Tink Toy to allow its wings to reach 90 degrees instead of 70 degrees, use of the toy would have placed less stress on its wings and potentially reduced the likelihood of a crack.  (See Doc. 110-4 at 8-9).  He supported that conclusion with calculations. (See Doc. 110-6 at 5).  He also opined that Jakks Pacific could have used a stronger material in the Tink Toy—namely, reinforced Nylon 66—which could have prevented the preexisting crack in the Tink Toy's wing from propagating and ultimately causing it to detach from the Tink Toy's body.  (See Doc. 110-4 at 8).  By way of further example, he also explained design changes could have prevented the weakness in the wing's "parting line," which he identified as the source of the initial crack.  (See 7/21/21 Tr. 83:10-85:4, 97:13-20; see also Doc. 110-4 at 8 ("Rotating the mold parting line 90° from its current location would greatly reduce crack initiation in the upper arm.")).  These proposed alternatives, combined with other proposals Dr. Pope identified, (see generally Doc. 110-4), are sufficient to create a genuine dispute of material fact as to whether the Tink Toy was defective.

###### 2.  *Punitive Damages*

Defendants contend plaintiffs have failed to put forth sufficient evidence to create a plausible claim for punitive damages.  Under Pennsylvania law, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others."  Hutchison *ex rel.*

Hutchison v. Luddy, 870 A.2d 766, 770 (Pa. 2005) (quoting Feld v. Merriam, 485 A.2d 742, 747 (Pa. 1984), and citing Chambers v. Montgomery, 192 A.2d 355, 358 (Pa. 1963)).  Put differently, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk."  Id. (citing Martin v. Johns–Manville Corp., 494 A.2d 1088, 1097-98 (Pa. 1985), rev'd on other grounds, Kirkbride v. Lisbon Contractors, Inc., 555 A.2d 800 (Pa. 1989)).  It follows that punitive damages are appropriate "only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct."  Id. (citing SHV Coal, Inc. v. Continental Grain Co., 587 A.2d 702, 704 (Pa. 1991); Feld, 485 A.2d at 747-48; Chambers, 192 A.2d at 358; RESTATEMENT (SECOND) OF TORTS § 908 cmt. b).  Mere negligence or gross negligence is insufficient.  Phillips v. Cricket Lighters, 883 A.2d 439, 446 (Pa. 2005) (quoting SHV Coal, 587 A.2d at 704).

A genuine dispute of material fact exists as to whether defendants exhibited reckless indifference.  As plaintiffs and Mr. Paolo point out, a report of the toy provided by Intertek—a neutral third party—recommended that "[t]he design of the submitted sample . . . be revised."  (Doc. 110-12).  Mr. Paolo put this recommendation in context:

> One big no-no in my business, being the champion for product safety and product quality for a manufacturer is, you would never leave a[n] Interte[k] report that was so egregious in your file without closing a loop, either writing some rational[e] to say this isn't valid for the following reasons or saying we . . . did redesign the product, and we addressed all of the concerns raised by

> this third party that we hired.  There was nothing like
> that in the file.

(7/21/21 Tr. 104:1-8).  The existence of this outstanding, and apparently

unaddressed, recommendation is alone enough to lead a reasonable juror to

conclude defendants knew of a risk of harm and disregarded that risk.

Further supporting our conclusion is Mr. Paolo's opinion that defendants

failed to (1) perform necessary testing on the Tink Toy, (2) adequately respond to or

consider customer complaints regarding the toy, and (3) take into consideration

recalls of other flying toys.  (See 7/21/21 Tr. 103:7-107:21).  Defendants offer no

meaningful rebuttal to Mr. Paolo's points regarding lack of testing or existence of

complaints regarding the Tink Toy in the punitive damages context.  (See Doc. 106-

3 at 31-34; Doc. 111 at 14-16).

As for recalled toys, defendants contend there is a lack of evidence

corroborating the similarity of previously recalled toys and that this evidentiary

void warrants summary judgment.  (See Doc. 106-3 at 32-34; Doc. 111 at 14-15).  Yet

Mr. Paolo testified that, based on his review of press releases detailing the recalled

toys, the toys shared similarities with the Tink Toy at issue in this case.  (See 7/21/21

Tr. 106:24-107:21).  We also note that Intertek cited four recalled toys in its report,

suggesting the recalls were, at minimum, relevant to its analysis of the Tink Toy

and its ultimate recommendation that revisions be made to that toy.  (See Doc. 110-

12).  Based on these facts, a reasonable juror could conclude that defendants

knowingly disregarded a risk to consumers when it sold the Tink Toy at issue.

IV.    **Conclusion**

We will deny the remainder of defendants' motion (Doc. 106) for summary

judgment.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    August 23, 2021